WESTINGHOUSE ELECTRIC & MFG. CO. v. UNION CARBIDE CO.

THOMSON-HOUSTON ELECTRIC CO. v. SAME.

(Circuit Court, W. D. New York.    November 11, 1901.)

Nos. 6, 7.

PATENTS—INVENTION—ELECTRICAL TRANSFORMERS.

The Westinghouse patent, No. 366,362, and the Thomson patent, No. 508,654, both relate to improvements in electrical converters or transformers, and claim 4 of the former, and claims 1 and 2 of the latter, specifically to devices intended to prevent excessive heating; the Westinghouse invention consisting in surrounding the parts of the converter with oil or paraffin contained in an inclosing case, and the Thomson invention in placing pipes within such casing in large converters, through which water is circulated to assist in cooling the oil, by means of which converters of much greater capacity than formerly are successfully used. *Held,* that the invention of each patent involves a new combination of both old and new elements, which performs new and additional functions, and accomplishes new and useful results; that each patent discloses invention, was not anticipated, and is valid.

In Equity.    Suits for infringement of patents.    On final hearing.

Kerr, Page & Cooper, for complainants.

Alfred W. Gray and George Clinton (A. C. Fowler, of counsel), for defendants.

HAZEL, District Judge.    These two suits in equity for infringement of United States letters patent No. 366,362, granted to George Westinghouse, Jr., July 12, 1887, and No. 508,654, issued to Elihu Thomson, November 14, 1893, substantially relate to the same general subject.    They are for improvements in electrical converters or transformers.    The suits were heard at the same time by consent of parties.    The complainants own the patents by assignments, and are jointly interested as cross licensees.    Patent No. 366,362 relates to the construction of an apparatus for transforming alternating currents "into currents differing therefrom in certain characteristics." The object of the invention is thus stated in the patent:

"To provide a simple and efficient converter, which will not become overheated when employed for a long time in transforming currents of high electromotive force, and which will be thoroughly ventilated."

The specifications, after describing in detail the accompanying drawings, which set forth features of the invention, contain the following:

"It may be preferred in some instances to surround the converter with some oil or paraffin or other suitable material, which will assist in preserving insulation, and will not be injured by heating.    This material, when in a liquid form, circulates through the tubes and the intervening spaces of the coils and plates, preserves the insulation, excludes the moisture, and cools the converter."

The patent has five claims.    The fourth only is stated to be infringed.    It reads as follows:

"The combination, substantially as described, of an electric converter, constructed with open spaces in its core, an inclosing case, and a nonconducting fluid or gas in said case adapted to circulate through said spaces and about the converter."

112 F.—27

Patent No. 508,654 is designed for transformer substations of comparatively large capacity, requiring care to prevent excessive heating, especially when they are kept in long continuous operation. The patent states that:

"Heretofore it has been customary to immerse transformers in oil contained within a metal casing, whereby heat is conducted and radiated away from the transformer. But there are many installations where such means of cooling are impracticable or insufficient, as, for instance, where transformers are built into the walls of buildings or located in underground chambers, where the casing cannot be ventilated, or where, with large transformers immersed in oil, insufficient radiating surface is obtainable to prevent overheating. For such installations as these it is specially desirable to provide an artificial cooling medium, as contemplated in the present invention."

The patentee claims as new:

"(1) The combination of a receptacle or chamber containing one or more transformers, surrounded by oil or like insulating fluid, with a cooling medium circulating in a pipe passing through a greater or less portion of the fluid, as set forth. (2) The combination with a receptacle containing one or more transformers, surrounded by an insulating fluid, of a pipe passing through said chamber and fluid, and means for causing a cooling medium to flow through said pipe, substantially as described."

The answer in each case pleads anticipation and want of novelty. It was stipulated at the time of taking proofs that defendant had in use one or more transformers, described by patents in suit, at its works, subsequent to the grant and assignment of said patents to complainants. If, then, the defense of anticipation and want of novelty fails, infringement is admitted. The Wagner Electric Manufacturing Company of St. Louis, Mo., furnished the alleged infringing transformers to the defendant, and it may therefore be regarded as the real defendant in each case. A brief recital of the state of the art will aid to a better understanding of the patents. The discovery and perfection of mechanical generators for the production of electrical current energy demanded an exact distribution and apportionment of the generated electricity for its employment in the many uses to which it could be commercially applied. By the generator an alternating current is produced, which changes uniformly in strength and intensity, and flows successively in one direction, until it reaches a maximum, and thereupon gradually diminishes in intensity until it ceases, only to immediately begin its flow in the opposite direction. For this reason great difficulty was experienced in bringing this powerful current, for the purpose of distribution, within such desired control as to permit its utilization for lighting, power, and many other purposes. Commutators having for an object the rectifying of alternating currents so as to secure uniformity of direction were invented, and proved highly successful. An apparent obstacle, however, was the limitation which the use of the commutator and dynamo imposed upon the generating capacity, and upon the distance to which the electricity could be transmitted and assigned for its useful and extensive application. The practicability of varying the volume and pressure of a primary and secondary current, so called, with reference to each other, was completely demonstrated by changing the relative length of the primary and secondary circuits within

the influence of an alternating magnetic field. This was accomplished by the numerical arrangement of the coils encircling the core. In this manner a volume and pressure of the induced and inducing current may be equalized. By similar arrangement, or by the varying size, thickness, character, or stability of the surrounding coils, a current of the desired intensity is obtainable. Thus the problem of simultaneous generation of electricity and its distribution at either high or low pressure was solved. The apparatus required for this purpose was named a converter or induction coil, and latterly a transformer. It is composed of two coils of insulated copper wire, wound around an iron core or frame near each other. They are designated primary and secondary coils, respectively. The former initially receives the electric current from the generator, and magnetizes the core, which thereupon becomes a conductor from the primary to the secondary coil. The particular purpose and object of transformers is tersely stated in defendant's brief to be "an apparatus whereby the current is generally transformed or converted from a certain pressure and quantity to a certain other pressure and quantity, or it may be transformed or converted to the same pressure or quantity, but usually is transformed or converted from a higher pressure and smaller quantity to a lower pressure and larger quantity, in order that the higher pressure may be transmitted on the lines outside of buildings, and transformed or converted to lower pressure and greater quantity for use in buildings." Their utility is well established. It has resulted in the expansion of the use of electric energy to such an extent that there is substantial basis for the claim that the invention of the static transformer and subsequent improvements has created a surprisingly memorable period in the development of electric science, followed by amazing commercial success. It made possible the utilization of electricity at far distant points, as well as its application in various ways, "and in any desired machine, from motors developing hundreds of horse power to the fragile filaments of incandescent lamps." Noteworthy as was the success attained by the generator, dynamo, and commutator, the surprisingly noteworthy advance in electrology made possible by the transformer is equally deserving of great praise. That improvements were needed to adapt the transformer to the manifold uses anticipated by those skilled in the art is not astonishing. The necessity of rapidly magnetizing and demagnetizing the core in a transformer resulted in the production of a great amount of heat, and a consequent loss of electrical energy. In order to obviate this difficulty, the plates which constitute the core were made of laminated iron, so as to suppress the Eddy currents in the core which caused the heating. This brings on a discussion of the patents in suit. The core of the Westinghouse patent is composed of thin plates of soft iron, in groups having sectional openings, and separated by thin sheets of paper or other insulating material. The insulating material is so arranged as to magnetically separate the plates in pairs. The method of constructing an induction coil or transformer having a core of thin plates is disclaimed by the patentee. It is not claimed to be new in the art to arrange a transformer so as to accomplish a means of ventilation

of the parts, and thereby prevent a waste of energy through heating.

The claim is that by the arrangement of various known elements, and by the introduction of new elements, to wit, dividing the iron into sections, and separating the coils, thereby increasing the surface over which heat dissipation in the core and coils may be carried on, aided by oil as an insulating material, and adding an inclosing case, a new combination, producing a new and beneficial result not before attained, is contributed to the art. The mechanical parts of the transformer are immovable and compact. They are so constructed as to enable the employment of a closed circuit of magnetic material. By this arrangement of the parts a superiority was undoubtedly obtained in durability, efficiency, and cheapness over prior transforming devices. The tendency of the transformers to become overheated, however, was an obstacle retarding their use for long-distance lighting, transmission of power, and other purposes. It was at this period that the Westinghouse patent in suit was conceived. Both the Westinghouse and Thomson patents in suit are for a combination of old and new elements. It is well settled that the right to patentability is established when the combination performs new and additional functions, and accomplishes new and additional results. 1 Rob. Pat. § 115; Cantrell v. Wallick, 117 U. S. 695, 6 Sup. Ct. 970, 29 L. Ed. 1017. What was the achievement of the Westinghouse and Thomson patents? The proofs show that more or less experimenting was required to develop the transformer in the then state of the art, so as to secure the transmission of higher electrical energy. The disposition of heat was a most serious question. Different sizes of transformers, varying from one-half kilowatt to seven and one-half kilowatts were then in commercial use. Larger sizes (fifteen to thirty kilowatts) had been started experimentally. In employing the larger sizes, a lower current density in the copper and lower magnetic density in the iron was necessary than in the smaller sizes. This greatly increased the expense of production of the required electrical energy. Later experiments proved the efficacy of filling the transformer cases with oil for reducing the temperature, and thereupon fifteen and thirty kilowatt transformers were advantageously operative, although heat convection still continued of such a nature as to require additional thought and labor. What Westinghouse failed to accomplish was later successfully performed by the invention of Thomson.

I am of the opinion that the invention of Westinghouse, consisting of a combination of elements, unless anticipated by the prior state of the art, is a distinctive step forward in the progress of electrology, in the light of the immediate recognition which it received by the public. It does not seem to me, under the circumstances, to have been obvious to those skilled in the art. Experiments were continued to further advance and make useful static transformers. In speaking of the efficacy of the Thomson transformer, and the surprising advance made by this invention over the state of the art, Prof. Moody, complainant's witness, says:

"Even with this aid to the cooling (oil), however, the temperatures of these 15 and 30 kilowatt sizes were much higher than we deemed safe, and

many experimental forms were made with the idea of producing a design which had a larger external surface compared with its volume. Such distortions of the design made it necessary to use more material to produce the transformer of a given efficiency of operation, and, when finally a design was decided upon for manufacture, there was a disappointing failure to produce a transformer of less cost per kilowatt as compared with the smaller sizes already produced in large quantities. * * * A later development, therefore, has been the use of coils of pipe through which water can be circulated, and which are placed in the oil of the transformer. * * * By making use of the various methods above described, no insurmountable difficulty has been experienced in building the largest unit yet called for commercially, which, as far as my experience goes, stops at a 2,500 horse power unit, equaling about 1,900 K. W."

The testimony shows that the experiments that were made to attain the desired efficiency of the transformer in the then state of the art required thought, labor, and skill of exceptional character. The greatest advantage, however, followed the use of water as a cooling medium at a temperature materially lower than the surrounding air. The superfluous heat being thus absorbed, the difficulty theretofore existing was overcome. No insuperable obstacle was thereafter experienced, and the Thomson transformers, capable of furnishing the increased unit of horse power for long-distance commercial purposes, went into immediate use. This production was the result of invention. Prior thereto what seemed to be insurmountable obstacles were presented. When the necessity for heat dissipation was gravest, and when further progress was arrested, no one familiar with these appliances—and many able minds were engaged in electrical research—came forward to suggest any remedial means employing mere mechanical skill or knowledge adaptable to similar appliances already in the field. It was only after patient endeavor and laborious experiment that success was attained. Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; Tooth Crown Co. v. Richmond (C. C.) 30 Fed. 775; Vickers v. Siddell (1890) 15 App. Cas. 496; Manufacturing Co. v. Adams, 151 U. S. 145, 14 Sup. Ct. 295, 38 L. Ed. 103. The public instantly recognized both patents in suit as an improvement on the prior art. Indeed, the proofs show that the maximum of large-size dry transformers—transformers without sectional openings in the core, and without the use of oil as an insulating material—is 10 kilowatts, or 13 to 14 horse power, while that of the large-size transformers of the Westinghouse patent in suit is 500 kilowatts, or from 650 to 700 horse power. The use of coils of pipe through which water can be circulated, and which are placed in the oil of the static transformer, found in the Thomson patent, increases the number of kilowatts to at least 2,000. The union of elements contained in the two patents in suit is not embraced or contained in any similar patented devices. The defendant contends that the various elements of claim 4 in the Westinghouse patent, and claims 1 and 2 of the Thomson patent, are old. Old though some of them are, they have been joined together for the first time by the patentees, who are the original and first inventors. Simple though the inventions may appear, they were produced as a result of labor and study. The degree of labor and thought is unimportant, in view of

the practical utility of the invention. Many v. Sizer, 1 Fish. Pat. Cas. 17, Fed. Cas. No. 9,056; Carr v. Rice, 1 Fish. Pat. Cas. 198, Fed. Cas. No. 2,440. The combination adopted by the complainants in each suit produces a new result, dependent upon the union of various elements never before combined together. The result is not merely an aggregation of the component parts, but a co-operation of all the elements producing a new result by their union. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Reckendorfer v. Faber, 92 U. S. 357, 23 L. Ed. 719; Pickering v. McCullough, 104 U. S. 318, 26 L. Ed. 749.

I have given examination to such of the patents as are claimed on argument to anticipate the combinations of the patents in suit. I incline to the belief that the elements of the patents in suit, constituting the combination for which the patents were issued, are not anticipated. I have already stated that in my judgment the various elements found in both patents sued on have never before been combined together, and that the union of elements contained in each patent is not embraced in any similar patented inventions. The combination itself being new, the effectiveness and efficiency of both transformers being increased,—a fact quickly recognized by the public,—it becomes obviously unnecessary to especially point out in detail the various differentiating structural features found in patents claimed to be anticipatory. Many of the patents cited to anticipate the Westinghouse patent relate to patents for dynamo-electric machines and other electrical devices, including transformers. None of them point out a way to dissipate the heat, although a number of them were designed to prevent waste energy produced by heat. In none of them is found the combination of elements contained in the Westinghouse patent in suit. The Pike and Barnett patents are for transformers immersed in oil, in a casing connected with pipes passing to an elevated oil receptacle stationed near the transforming apparatus, for the purpose of increasing the radiating surface. The liquid is maintained in constant circulation around and through the coil by the change of specific gravity due to the change of temperature of the oil. The heat may be extracted by a water jacket connected with the vessel containing the oil. In the Thomson patent, as we have seen, a coil of the pipe through which the water constantly circulates passes through the transforming chamber and oil or other conducting fluid contained therein. No extended external surface or separate apparatus is required to make the Thomson patent operative. A receptacle or chamber is constructed of sufficient size to contain one or more transformers surrounded by oil. The oil is cooled in the transforming chamber, and not, as in the Pike and Barnett patent, in a separate vessel elevated from the transformer, and evidently was, as the patent states, designed to be built into walls of buildings or located in underground chambers. I do not think these patents anticipate that of Thomson. None of the others, in view of what has been stated, need be discussed.

The point is made by defendant that, inasmuch as various claims contained in the original application filed in the patent office for the Westinghouse patent in suit were rejected by the commissioner of

patents, were thereafter canceled, and substitution of other claims allowed, the patentee conceded, among other things, that open spaces between the coils were not new, nor was it new to have gas or non-conducting fluid adapted to circulate through the spaces and about the transformer.   All that may have been done by the patentee, yet a patent for a combination of old and new elements, co-operating together, was granted him by the patent office, and the presumption of patentability to which he is entitled by reason thereof has not been overcome by the defendant.   The Westinghouse patent stated that the plates are preferably separated, and that it may be preferred in some instances to surround the transformer with oil or paraffin or other suitable material.   It is stated by the patent that "the converter or transformer may be sealed in an inclosing case, and may or may not contain a nonconducting fluid or gas."   It is insisted that these are matters of preference or recommendation only, and do not constitute essential features of the patent, but this, however, must be read with claim 4 of the patent.   It is quite true that a feature which is mentioned only by way of recommendation in describing an invention must usually be considered as a subordinate, and not an essential, part of the patent.   Holliday v. Pickhardt (C. C.) 29 Fed. 853; Sewall v. Jones, 91 U. S. 171, 23 L. Ed. 275; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Krajewski v. Pharr, 44 C. C. A. 572, 105 Fed. 514.   But the claim upon which complainant relies still clearly indicates the intention of the patentee to claim as essential the features described by the specifications as preferably employed.

Decree for complainant may be entered in each case.