## SOUTHERN ELECTRO–CHEMICAL CO. v. E. I. DU PONT DE NEMOURS & CO.

(District Court, D. New Jersey. August 14, 1925.)

1. Patents ⬤⟲36—Invention not inferred because inventor's name was mentioned in correspondence between experimental department heads and superintendents.

Invention of a method for concentrating nitric acid cannot be inferred from circumstances that, in correspondence between experimental department heads and superintendents, inventor's name and his work was mentioned, nor from circumstances that text-writers described his method.

2. Patents ⬤⟲40—Discovery of new advantage in old process not subject of patent.

Discovery of a new advantage in an old process is not subject of a patent.

3. Patents ⬤⟲37—Novelty must lie in more than doing precisely same things that prior art did.

Novelty must lie in more than doing precisely same thing that prior art did.

4. Patents ⬤⟲328—Pauling patent, 1,031,864, for method of concentrating nitric acid, claims 1, 3, and 5, held invalid.

Pauling patent, No. 1,031,864, claims 1, 3, and 5, relating to method of concentrating nitric acid by passing aqueous nitric acid in mixture with sulphuric acid, or other suitable dehydrating agent, against a counterflowing current of steam, or of a mixture of a large proportion of steam with gases inert toward nitric acid, held invalid, in view of prior art.

In Equity. Patent infringement suit by the Southern Electro-Chemical Company against E. I. Du Pont de Nemours & Co. Bill dismissed.

Burroughs & Brown, of New York City (Livingston Gifford, Richard Cavanagh, and J. Granville Meyers, all of New York City, of counsel), for plaintiff.

Prindle, Wright, Neal & Bean, of New York City (Edwin J. Prindle, William H. Davis, and Arthur Wright, all of New York City, of counsel), for defendant.

BODINE, District Judge. This suit charges the defendant with infringement of claims 1, 3, and 5 of United States letters patent to Harry Pauling, No. 1,031,864, granted July 9, 1912, for method of concentrating nitric acid, and assigned to and owned by the plaintiff. The bill prays an injunction and an accounting for profits and damages.

The bill of complaint was filed May 15, 1920, and defendant replied by answer filed October 20, 1920, amended November 6, 1922, further amended December 26, 1922, and again amended February 16, 1923. As defendant's answer thus amended presented 171 patents and publications, both United States and foreign, showing an alleged anticipation and the prior art, on February 5, 1923, the defendant was required to furnish a bill of particulars as to the patents and publications to be relied upon to illustrate the prior art. The defendant eliminated over 100 references.

On April 11, 1923, while the rebutting testimony of Dr. McKee, one of plaintiff's experts, was in progress, the court permitted the defendant to make certain tests, under certain conditions, upon an apparatus at its plant at Repaupo, N. J. From May 8 to 12, 1923, defendant, in the presence of plaintiff's representatives, conducted these tests. Defendant then took the testimony of its witnesses as to the tests.

Plaintiff then erected at Warners, N. J., certain tower apparatus for the purpose of conducting tests in rebuttal, of defendant's tests. On March 17, 1924, the tower apparatus at Warners, N. J., having been completed, plaintiff made the tests in the presence of defendant's representatives. The testimony as to these tests is to be found in the record. Dr. McKee, in resuming his rebuttal testimony, stated his views. There is also testimony as to laboratory tests made at Columbia University at the instigation of the plaintiff.

The record is exhaustive of the subject-matter. Counsel have sought to illuminate a very difficult case with infinite patience and skill. The invention is best described in the specifications of the letters patent. It is well, however, to bear in mind, in this connection, that nitric acid usually contains about 50 per cent. of water; that boiling beyond a certain point will not eliminate the water without carrying off the nitric acid. The prior art was familiar with a batch process of water elimination carried on by mixing sulphuric acid with the nitric acid and applying heat; the sulphuric acid locking up the water and carrying it off in evaporation. This process was bulky and expensive.

In the manufacture of explosives, particularly nitrocellulose compounds, the spirit acids contain a mixture of sulphuric acid, nitric acid, impurities, and water. The elimination of the water and impurities and the obtaining of pure sulphuric acid is known as a denitrifying process. This process was, for years, carried on in a tower; the strongest nitric acid obtained being from 50 to 65 per cent.

It is the plaintiff's contention that the denitrifying and the high concentration combined in one apparatus was Pauling's contribution to the art; nitric acid up to 98 per cent. of concentration being obtained by the use of his tower. Pauling used a path described as of sufficient length to give the steam time to condense into water and be locked up by the sulphuric acid, and asserts that the best results are obtained by the use of acids free from organic matter.

The specifications of the letters patent are as follows:

"This invention relates to processes of concentrating nitric acid, and it comprises passing aqueous nitric acid in mixture with sulphuric acid or other suitable dehydrating agent against a counterflowing current of steam, or of a mixture of a large proportion of steam with gases inert toward nitric acid; the conditions of operation being such that highly concentrated vapors of nitric acid are obtained, while the water originally present in the aqueous nitric acid is substantially all taken up and retained by the dehydrating agent.

"A known method of concentrating nitric acid consists in subjecting the acid to a kind of countercurrent treatment, for example, by introducing the nitric acid and a drying agent, preferably sulphuric acid, into a vertical pipe, at the upper end, and heating the pipe from the outside. This necessitates apparatus of large dimensions, since, in order to avoid the formation of nitroso-sulphuric acid the temperature must not be raised too high. Nitroso-sulphuric acid, if formed, can only be decomposed by high dilution, and dilution is, of course, contrary to the purpose of the process. Moreover, the filling mass placed in the pipe cannot be so arranged as to secure perfectly uniform distribution of the mixture, so that local overheating and decomposition of nitric acid occurs. Similar disadvantages attend the proposed method of passing the mixture downward through a column through which hot air or other gases are passed in an upward direction, in order to supply heat for distilling off the nitric acid. The air must not be too hot, for the reason already mentioned; so that a large quantity of air and large apparatus are required. The nitric acid vapor is highly diluted with air (or other gas), and this dilution favors decomposition of the acid and considerably interferes with condensation of the vapors. The hot air or other gas carries away a certain proportion of acid, which is lost. The present invention obviates these disadvantages, while securing certain new advantages, and involves the use of steam, or a mixture of steam and gas, as the heat carrier flowing as a countercurrent against a stream of nitric acid and sulphuric acid or other hygroscopic substance. During the passage of the steam the nitric acid is almost wholly separated from the mixture; the team is gradually absorbed by the sulphuric acid, and converted into water, whereby its latent heat is liberated and utilized for evaporation of nitric acid. This process

takes place along the whole common path of the streams, and by using a path of sufficient length nitric acid of the highest possible concentration is obtained, and practically all traces of nitric acid are removed from the sulphuric acid. The best results are obtained with mixtures free from impurities, such as organic matter, nitrogen oxides, and nitroso-sulphuric acid. Under the conditions of operation here contemplated, nitric acid of 96 to 98 per cent. strength is easily obtained from a mixture containing one part of 48 per cent. nitric acid to two parts of 94 per cent. sulphuric acid; the whole of the nitric acid being obtained at the strength stated.

"The most simple method of carrying out the process comprises passing the mixture of acids through a vertical pipe or column from the top downward, and passing in dry steam at the bottom; the pipe being partly filled with a suitable 'filling' mass. Preferably the steam is superheated, but this is not essential. Instead of pure steam, inert gases mixed with a large proportion of steam may be used. 'Countercurrent' apparatus other than a vertical column may be used. The rate at which the hot gaseous medium is supplied to the base of the column should, of course, be so regulated that highly concentrated nitric acid vapors leave the outlet at the top of the column, while the spent sulphuric acid leaving the base of the column retains substantially all the water originally present in the dilute nitric acid."

The claims in suit are the first, third, and fifth as follows:

"1. The process of concentrating aqueous nitric acid, which comprises passing aqueous nitric acid in admixture with a suitable dehydrating agent against a countercurrent of a hot gaseous medium composed largely of steam, and so regulating the conditions of operation that vapors of highly concentrated nitric acid are obtained, while the dehydrating agent takes up and retains substantially all the water of the aqueous nitric acid."

"3. The process of concentrating aqueous nitric acid, which comprises passing aqueous nitric acid in admixture with sulphuric acid against a countercurrent of steam and so regulating the conditions of operation that vapors of highly concentrated nitric acid are obtained, while the sulphuric acid takes up and retains substantially all the water of the aqueous nitric acid."

"5. The process of concentrating. aqueous nitric acid, which comprises passing a mixture of aqueous nitric acid and strong sulphuric acid, substantially free of impurities such as nitroso-sulphuric acid and organic matter, against a countercurrent of steam, and obtaining vapors of highly concentrated nitric acid."

The first claim is not limited to superheated steam. The third claim is limited to sulphuric acid, while the first includes any dehydrating agent. The fifth claim requires that the mixture of acids be substantially free from impurities, such as nitroso-sulphuric acid and organic matter.

The validity of Pauling's German patent, effective from March 31, 1910, was sustained in 1920 by a decision of the German appellate court. That decision so far as pertinent, is as follows (the italics throughout the opinion are mine):

"It appears easily that the patent of the defendant compared with the publications cited brought forth new matter. *Those publications relate to the denitration of sulphuric acid.* Thus the aim was different from that of the contested patent, and to that aim, viz. denitrating the sulphuric acid, corresponded the process. *Developing the process in the direction of obtaining highly concentrated nitric acid was not intended at all.* This problem does not appear in any of the publications in question and no means is stated to solve it. *Thus the patent of the defendant* (the plaintiff here) *contained new matter.* That the substances employed in highly concentrating the nitric acid do not contain impurities is no point in the patent.

"The plaintiff has, indeed, furthermore asserted that the invention of the defendant has not been patentable. This appreciation, however, cannot be accepted. The invention relates, it is true, only to a slight deviation from the old denitration process; still, it was not so very nigh-laying, that an expert intending manufacturing highly concentrated nitric acid could easily think of it. *Also a professional man who exactly knew the old process need not arrive at the idea that quite another result could be attained according to the height of the tower.* This is revealed by the patent to tthe defendant, and a new, particular way for obtaining highly concentrated nitric acid has thereby been shown the technical domain in question."

Pauling was a highly educated chemist. In his employ, at the time he made the alleged discovery, was Ingenuin Hechenbleichner, who is now consulting engineer for the plaintiff. The following excerpt from his testimony discloses the manner of the alleged discovery and the extreme closeness of the invention to the old denitrating columns de-

scribed in the text books—particularly Lunge:

"One day, Mr. Pauling—that was, I believe in 1910—came in the laboratory and told us (there was myself and Mr. Foster, another chemist, who was also employed by Mr. Pauling) to put up an apparatus consisting of 1½-inch glass tube approximately 2 feet long and connected with a source of steam on the bottom and connected at the top with an ordinary glass condenser. We left an opening at the top for the thermometer to be put in for taking the temperatures, and a place where we could put in the mixture of nitric and sulphuric acid. And it took us a few days to do this, and Mr. Pauling explained to us what he meant in putting it this way up. We said, 'Well, that is nothing else but a denitrating column.' He said, 'Denitrating columns are all wrong.' He said, *'The path in the denitrating column is not long enough for doing the full amount of work, as it can be done.'* And we doubted very much if it would give any results, but we got right away a concentrated nitric acid over 96 per cent.

"After we made these experiments for a few days—I mean we had been satisfied with the first results, and we went on and made similar experiments for a week, and modified conditions, and we found, if we made everything proper, the proper regulation, we got concentrated nitric acid.

"Q. 25. How did you manage to get a long enough path? A. The column was filled with very small pieces of glass, about, I should say, *we took glass tubes about an eighth of an inch in diameter, and cut them off about a quarter of an inch long, and filled them in tight in the place, so that the paths were very long, because it could not travel up straight; it had to go all around.'*

From the portion of the testimony above quoted in italics, it is apparent that one of the methods of obtaining the path of sufficient length was to make the fill particularly small; the smaller the fill the greater the surface to be traversed, and therefore the greater the length.

[1] Pauling's work interested manufacturers of explosives. Invention, however, cannot be inferred from the circumstance that, in correspondence between experimental department heads and superintendents, Pauling's name and his work is mentioned, nor from the circumstance that text-writers described his tower. Mr. James B. Duke negotiated for the purchase of the American rights in the patent. The plant at Nitrolee, S. C., was built in accordance with the plans

of Pauling and the process and apparatus are substantial duplicates of those built in Germany.

The plaintiff's paper title to the patent in suit rests upon an assignment from Fritz Berkinfeldt, liquidator of the German company, the assignee of the patent. The defendant contends that the liquidator was without power under the German law to make the assignment, not having been properly appointed, and further urges that, if the power existed, it was exercised by the official liquidator in his individual and not in his representative capacity. Another point urged is that the corporation improperly organized was a de facto corporation, without power to take any rights under the patent. Since the decision of this case may well rest upon other grounds, no useful purpose can be served by examining the somewhat conflicting testimony as to German law and a discussion of the principles applicable. The court has assumed, without deciding, that the plaintiff's title is valid.

The defense of invalidity of the patent is, in substance, that the process is the same as occurs when a steam-heated denitrating tower is efficiently operated (without excess of steam) in performing its denitrating operation; and that when such a tower is so operated upon a mixture of nitric and sulphuric acids to efficiently produce substantially complete denitration of the sulphuric acid, *highly concentrated nitric acid is always and of necessity produced* at the same time as an unavoidable concomitant of the efficient denitration, unless organic matter interferes and decomposes the nitric acid, with simultaneous *generation of water;* that there can be nothing patentable in *omitting organic* matter from the feed acids in a steam-heated tower; that there is an absolute identity between the process going on in a steam-heated denitrating tower, when efficiently performing its denitrating function, with that in a so-called Pauling tower. The prior art steam-heated denitrating towers, when efficiently denitrating their nitroglycerine or other waste acids with a minimum of steam in the only way, by the only process, which they were capable of performing, were performing identically the same process as that of the Pauling patent, except for the action of the organic matter on the otherwise highly concentrated nitric acid.

The defense, in the last analysis, is that the one and only process which is necessarily and unavoidably practiced when denitration is being performed efficiently is an anticipation of the patent in suit, because it is *iden-*

*tical with the process of that patent.* The plaintiff's answer to this defense is that a process patent cannot be anticipated by an apparatus capable of performing the process. Carnegie v. Cambria, 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Expanded Metal Co. v. Bradford, 214 U. S. 366, 383, 29 S. Ct. 652, 53 L. Ed. 1034. The defense is, however, that it is the very denitrating process efficiently carried on which produces the concentration.

The history of the infringement is of no great importance. It should, however, be noted in passing that heretofore the relations between the parties have been such as prevail among business men of the highest integrity and ability. General Du Pont knew of the plant at Nitrolee. The Du Pont engineers inspected it and were told about everything. Negotiations were under way for the purchase by the Du Ponts of a half interest in the investment at cost. Aside from the physical examination of the plant and its process, the books were examined by accountants. Nothing came of the negotiations. The Du Ponts, however, erected a tower in Delaware exactly like the plaintiff's within a very short time after the negotiations lapsed, and used the process thereafter. It was only during the war that the plaintiff's suspicions were aroused by a chance remark of a Navy officer, who was planning a development at Indian Head, Md. It may well be said of the defendant: "It gives the tribute of its praise to the prior art. It gives [the Pauling tower, the grantee] the tribute of its imitation." Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 440, 31 S. Ct. 444, 55 L. Ed. 527.

The concentration of nitric acid by the Pauling process, the plaintiff's witness Hough testified, resulted in a saving at his Canadian plant of from $13 to $14 a ton. There can, however, be little doubt as to the utility of the process. It may be that it was not until the Great War that there was demand for large quantities of the concentrated acid. However, when the demand occurred, it was the process that the plaintiff had in use in 1913 that was seized upon as the most available means of accomplishing a necessary result.

In this case, as before suggested, there is no question of identity of means nor utility of the invention; the sole question is one of novelty. The plaintiff's contention is that novelty lay in what are called three entirely new concepts: (1) That steam might be conducive to high concentration of nitric acid. (2) That a steam path of sufficient length would be conducive to high concentration. (3) That the acids must be substantially free of organic impurities.

Of the witnesses called, Dr. Sohlman made the most profound impression. He was the associate and later the executor of the estate of Mr. Alfred Nobel. He had a familiarity with the explosive manufacturing business of continental Europe that was unique. He came to give his testimony without interest in the outcome of the case, and at very great personal inconvenience. Sohlman was the holder of United States letters patent No. 1,009,196 and No. 1,009,197. These patents used hot air rather than steam for the concentration of nitric acid. Otherwise, the process seems identical with that of the patent in suit. Messrs. Birkland and Eyde had a synthetic process for the production of nitric acid from the air. Dr. Sohlman desired a process for concentrating this acid. Mr. Brulfer made towers for the distillation of a mixture of nitric and sulphuric acids. Dr. Sohlman acquired two of these towers, about 16½ feet high and 1 foot in diameter, filled them with broken quartz, applied external heat, and ran the concentrated nitric acid off at the top and the sulphuric acid at the bottom. Concentration up to 97½ per cent. was obtained. Heated gases were also applied through the tower to obtain greater production and purity. This work was carried on in 1907, and the references to the process are contained in the patent in suit. Dr. Sohlman carried the concentration method on for a time, but, unable to make satisfactory arrangements for electric power in Sweden, practical commercial production ceased.

Dr. Sohlman's steps with the steamless process of concentration passed beyond the experimental stage. Commercially, he concentrated the nitric acid in a tower. He used external heat, instead of steam. The prior art was familiar, however, with a steam process of denitrifying sulphuric acid. Nitrous oxides were at early times removed from sulphuric acid by the chamber process. Then denitrating towers were used to separate the sulphuric acid from nitrocellulose and nitroglycerine waste acids. The towers were short and the acids were passed down against countercurrents of steam. The nitric contents would vaporize and pass out with the steam at the top, and the sulphuric acid purified would pass out at the bottom. The nitric acid was, of course, trapped at the top of these towers, and contained sometimes as much as 68 per cent. pure acid, which, **if**

greater strength was required, was redistilled by the bath process. Highly concentrated nitric acid boils at 86° C. Sulphuric acid boils at 200° C. Water is locked up by sulphuric acid, so that, when the steam brings the nitric acid to the boiling point, if it is condensed into water, it is carried off by the sulphuric acid. It is not the steam that dehydrates the nitric acid, but the sulphuric acid which accomplishes the result. The length of the tower, which bears, of course, a relation to the work to be done and the materials to be distilled, functions by reason of the different degrees of vaporization of the liquids.

The steam tower was the chemist's tool for separating liquids of different boiling points. It was used in separating ammonia from gas liquor, benzol from the heavy oil, which is used in extracting it from illuminating gas, and alcohol from a water solution. In between the fillings of the tower are in reality small stills, that function as the ordinary still functions, and as the temperature of the heating medium becomes less at the top, it operates differently upon the mixture of liquids fed into the tower, and so separates them.

Dr. George Lunge, in his work on the manufacture of sulphuric acid, published at London, 1891, shows a steam denitrating tower (Fig. 221) 13 feet 1 inch high, with an inner diameter of 1 foot 3½ inches, and a receptacle for catching the nitric acid at the top and the sulphuric acid at the bottom. The following excerpt from page 564 is illuminating:

"The steam is introduced into the column through the pipe $F$, near its bottom, at such a height that the mouth of the steam pipe remains above the sulphuric acid collecting there. This mouth is covered up and built round with bricks in such a way that proper channels remain for the steam and the acid. On the top of this the column is filled with bits of flint nearly up to its cover; they are about the size of a fist near the bottom, and decrease towards the top to the size of a walnut. In the place of these, some works use bits of broken stoneware. The nitrous vitriol running in at the top trickles down through the bits of flint, and is decomposed in this way by the rising steam. Whilst the nitrous acid given off from it goes away into the chamber through the pipe $E$ in the state of vapour, the sulphuric acid, diluted by the condensed water, arrives at the bottom of the steam column, and runs through the pipe $G$ into the tank $H$."

The plaintiff's expert, Dr. McKee, did not feel that the Lunge tower would be effective, because not sufficiently long.

The Repaupo tests were made with two towers, one a 13-foot tower said, by the defendant's expert, to be substantially like the one described by Lunge, and said by Dr. McKee to be so different that the test amounted to nothing. The 24-foot tower was such an one as the Du Ponts had for some time been using. The towers were used for the purpose of denitration and concentration. Synthetic acid, nitroglycerine waste acid, and nitrocotton waste acid were respectively used. A table of the experiments shows that the results were substantially the same with the same types of acids in both towers, but that thorough concentration of nitric acid was obtained only when acids substantially free from organic matter were used. The prior art did not use the acids free from organic matter in the steam denitrating tower; hence the weak concentration, the impurities breaking down the nitric acid at the top of the column. Dr. Sohlman used the pure acids in his towers. The Repaupo tests have been so severely assailed that it seems expedient to incorporate here the results of the tests at some length.

Three runs were conducted upon each of the two towers. Run I was to determine whether or not it was a fact that, when a synthetic mixture of nitric and sulphuric acid, free from organic matter, was fed to the tall tower, and when the conditions were so controlled that substantially complete denitration was obtained at the bottom of the tower, vapors of highly concentrated nitric acid were simultaneously obtained at the top of the tower. Both Drs. Walker and McKee had stated that these results would be obtained in the 24-foot tower with a *synthetic mixture*, that is, a mixture of pure sulphuric and nitric acids, and this opinion was confirmed.

Run II, also in the tall tower, was made with *nitroglycerine waste acid*. The purpose of the test was to determine whether or not it was the fact that when a nitroglycerine waste acid, *containing organic matter* which is attacked by nitric acid, is supplied to a tall tower, and when substantially complete denitration is obtained at the bottom of the tower, there is at the same time discharged from the top of the tower vapors of highly concentrated nitric acid. Professor McKee had stated that such would be the case, while Dr. Walker had stated that such would not be the case. This run showed substantially complete denitration at the bottom of the tower, but the vapors of nitric acid being discharg-

ed at the top of the tower, when free from the oxides of nitrogen which normally condense with such vapors, were not those of highly concentrated nitric acid, being approximately 55 per cent. This was all that the prior art, working with nitroglycerine waste acids, could obtain.

Run III was made with nitrocotton waste acids, and highly concentrated nitric acid was obtained.

Run IV was made in the short tower, by feeding a synthetic waste acid, free from organic matter, similar to that employed in the tall tower in run No. I. Dr. Walker says of this run:

"*  *  *  The purpose of this test was to determine whether it is or is not possible to obtain vapors of highly concentrated nitric acid at the top of the tower, the internal height of which is approximately 13 feet, and with an internal diameter of approximately 15 inches, and which is filled with crushed quartz of a size varying from that of a fist to that of a walnut, when the conditions of operation were such that substantially complete denitration was being obtained at the bottom.

"Professor McKee had stated that it was not possible to simultaneously obtain these dual results in a tower having the above-mentioned dimensions and filling, while I had stated that, with such a tower and a feed acid free from organic matter, such dual results were possible and obtainable. The results of this run are given under the caption 'Run No. 4' in the table, and show that, when substantially complete denitration was being obtained at the bottom of the tower, the vapors of nitric acid issuing from the top were those of highly concentrated nitric acid, being approximately *96 per cent. nitric acid when the distillate was freed* from the oxides of nitrogen which normally dissolve in it in the condenser."

Run V was made by feeding the nitroglycerine waste acid, similar to that used in the 24-foot tower in run No. II, into the short tower. Dr. Walker states:

"Nitroglycerine waste acid was fed to the short tower, and again conditions were maintained such as would give the highest possible concentration of nitric acid vapors that it is possible to get from this waste acid."

The highest concentration of nitric acid obtained was about 62 per cent.

Run VI was made with nitrocotton waste acid in the short tower, simply to determine what strength of acid would be obtained from a feed acid containing organic matter very much less in proportion to the nitric acid

present than in the nitroglycerine waste acid previously employed, and of a different kind of organic matter. Approximately 92 per cent. nitric acid was obtained at the top of the tower; the percentage being determined after the oxides of nitrogen had been removed from the distillate.

To examine each objection to each part of the tests made at Repaupo is to restate the differences between experts in a highly technical sphere. The defendant's contention is that the Repaupo tests demonstrate that Pauling contributed nothing to the prior art, and that when a Lunge tower was built, and run with either synthetic acids or nitrocotton waste acid, substantial concentration of nitric acid occurred at the top, while substantial denitration of the sulphuric acid occurred at the bottom. The points of difference would probably be impossible of solution, but for the plaintiff's tests at Warners, N. J., with a prior art tower; the results being in exact accord with the results at Repaupo, no other conclusion can be reached than that the prior art towers would, when substantially pure acids were used, effectively concentrate nitric acid, while effectively denitrating the sulphuric acid.

At Warners, the plaintiff obtained the following results with acid of its selection:

| Time. | Concentration of Nitric Acid. | Nitric Content Denitrated Sulphuric Acid. |
|---|---|---|
| 12:00 | 15.36 | .009 |
| 12:30 | 16.98 | .010 |
| 1:00 | 35.26 | .016 |
| 1:30 | 39.90 | .016 |
| 2:00 | 84.59 | .103 |
| 2:30 | 45.81 | .021 |
| 3:30 | 69.74 | .029 |

Of course, the acid used was not that described in Lunge's book above quoted. The tests were made under conditions justified by the prior art, and for the purpose of obtaining substantially complete denitration. Counsel stated before anything was done:

"The intentions of the plaintiff in making this test is to conform to the test of the defendant with its so-called 13-foot tower as to the acid employed and the degree of denitration obtained, and *to depart from the defendant's test* in other respects *only so far as it is necessary to conform with the prior art references* in respect to the construction of the tower and its method of operation."

It is only fair to state that the experiment was of plaintiff's making and the conditions were of its choosing. The sample at 2 o'clock shows the greatest concentration of nitric acid and the greatest denitration of sulphuric

acid. The average does not support defendant's contention. The record shows, however, that up until 2 o'clock the steam was being checked; hence the increasing efficiency of operation.

The following excerpts from Dr. William H. Walker's testimony support the defendant's contention that, as soon as it was apparent that the Warners tests would support the case of the defendant, more steam was applied, which, of course, diluted the nitric acid and the sulphuric acid.

"Q. Please describe the tests made by plaintiff's representatives, including the running of the tower and the products produced? * * * A. After the samples were taken at 12 o'clock, the feed of the steam was cut down slightly, so that by 12:30, when the next set of samples were taken, the sulphuric acid was somewhat stronger, as was also the nitric acid flowing from the top of the tower. They were still, however, both very dilute; the amount of nitric acid held in the residual sulphuric acid flowing from the tower was negligible, being in the last case .01 per cent. The steam was then further cut down, as is shown by a study of the results, which I will not here discuss in detail, until 1:30, when a more rapid decrease in steam than heretofore had taken place was effected. The sample of sulphuric acid taken at 2 o'clock, namely, No. 10, had a composition of 64.1 per cent., with a residual nitric acid content of .103 per cent. while the nitric acid flowing from the top at this time had a composition of 84.59 per cent. *After this sample was taken, the steam was* again increased, as is shown by the results, so that at *2:30 the sulphuric had fallen* again to 58.7 per cent. in strength, and carried a residual nitric acid of .021, while the nitric acid discharged from the top dropped to 45.81 per cent. At this *point the steam was again cut down* somewhat, and again the sulphuric acid rose so that at 3:30 it had a strength of 60.3 per cent., with a residual nitric acid of .029 per cent., and the nitric acid discharged from the top of the tower had risen to 69.74 per cent. During the progress of the experiments the amount of nitric acid in the discharged sulphuric acid was determined quantitatively by a chemist who was employed for this purpose, and who determined these amounts at each five-minute interval. At first the amount of nitric acid which was discharged from the second condenser was quite appreciable, because the amount of steam was so large that the first condenser failed to liquefy all of it. As the steam was cut down, however, the first condenser proved to be sufficient, so that by 2 o'clock practically no acid was flowing from the second condenser.

"Q. When samples Nos. 11 and 15 of the nitric distillates were taken, respectively, at 2 and 3:30 o'clock, was any nitric acid flowing from the second condenser, and, if so, how much? A. No. There was practically no acid flowing from the second condenser. It dropped occasionally, but the volume was relatively small.

"Q. Did any incident occur relative to the regulation of the steam immediately after sample No. 11 of nitric distillate was taken at 2 o'clock, and, if so, what? A. Sample No. 11 was taken at 2 o'clock by Dr. Zeisberg and Dr. Murrill, while the corresponding sulphuric acid sample, namely, No. 10, was taken by Mr. Hough. Immediately after taking the nitric acid sample, Dr. Zeisberg placed a hydrometer, which is an instrument for the determining of the specific gravity of the liquid, in the nitric acid and then left in company with Dr. McKee for lunch. I read the hydrometer, and found it to be 1.47, and announced that fact. At that time, or very shortly after, Mr. Hechenbleichner returned from lunch, and, seeing the sample of nitric acid, and I think hearing me state the specific gravity, announced that the steam had been cut down too much, that the sulphuric acid would show at least one-tenth of a per cent. nitric acid, and without waiting for an analysis, or without consultation climbed to the top of the tower and immediately turned on the steam. Obviously he had had experience with the conduct of the tower; for, as this analysis shows, his prediction of the content of nitric acid in the sulphuric acid when the nitric acid discharged from the top had a specific gravity of 1.47, and, as shown by the analysis, a percentage of 84.59 was surprisingly accurate. No attempt was made to cut the steam lower than had existed at 2 o'clock when this sample was taken, but, on the contrary, it was turned on very strongly, as is shown by the excessive dilution of the nitric acid which followed in the succeeding half hour."

The next tests made were at Columbia University. They were laboratory tests. The plaintiff contends that they showed high concentration when nitroglycerine waste acids were used, irrespective of impurities, if a sufficient length of tower was used. The other tests, however, showed that with substantially pure acids high concentration could be secured, irrespective of length of the path. The patent describes the composition of the mixture and its freedom from organic matter. The Repaupo and Warners tests show

high concentration with the prior art towers; hence it would seem most immaterial to the issues involved what the Columbia University laboratory tests demonstrate.

The process of concentration of nitric acid went on in the prior art towers while denitration was taking place. With purer acids, greater concentration occurred. This court cannot sustain the patent and hold with the German court without overlooking the fact that concentration does occur with the use of pure acids, and that it occurs, whether the tower be a prior art 13-foot tower or a 24-foot Du Pont tower.

In Buckan v. McKesson (C. C.) 7 F. 100, the patent involved a new and improved composition for soap; i. e., the addition of carbolic and cresylic acid. The prior art of McDougall's showed the use of carbolic acid or creosote. Mr. Justice Blatchford, sitting as Circuit Judge, said (page 106):

"Although the crude carbolic acid or the creosote directed by McDougall [prior art patentee] to be used did not contain carbolic or cresylic acid as pure or as concentrated as it was afterwards made, there was no invention in using the purer article, provided the prior compound was a true soap, developing the properties of the acids referred to. The advance was only one of degree, so far as the use of the acids was concerned."

Mr. Justice Day said in Expanded Metal Co. v. Bradford, 214 U. S. 366, 384, 29 S. Ct. 652, 657 (53 L. Ed. 1034), quoting from the opinion of Mr. Justice Bradley in Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. *If new and useful,* it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable, whilst the process itself may be altogether new and produce an entirely new result. *The process requires that certain things should be done with certain substances, and in a certain order;* but the tools to be used in doing this may be of secondary consequence."

Can it be said that Pauling had a new method of treating materials? He passed the acids against a countercurrent of steam. This was old. And everything he did in the concentration process went on in the denitrating process. He used purer acids than

the prior art, but in this he could get no monopoly.

[2] The 13-foot tower built at Repaupo, when nitroglycerine waste acids were used, obtained 62 per cent. nitric acid, and when nitrocotton waste acids were used obtained 92 per cent. nitric acid. The 13-foot tower built by the plaintiff at Warners was about to demonstrate the same fact, when it was rendered ineffective by the addition of steam. If the Repaupo tower was not according to the disclosure of Lunge, the Warners tower was. Hence the prior art tower would have, when efficiently operated with nitrocotton waste acids, procured precisely the same results as plaintiff secured at Nitrolee. Certainly the discovery of a new advantage in an old process is not the subject of a patent.

The test of invention is stated by Mr. Justice Brown in Potts v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 199 (39 L. Ed. 275), as follows:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use, but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

The prior art tower highly concentrated the nitric acid, when substantially pure acids were used. There was no change in process; merely a change in the quality of the acids used.

Mr. Justice Brown said in Western Electric v. LaRue, 139 U. S. 601, 606, 11 S. Ct. 670, 672 (35 L. Ed. 294):

"While the promotion of an old device, such, for instance, as a torsional spring, to a new sphere of action, in which it performs a new function, involves invention, the transfer or adaptation of the same device to a similar sphere of action, where it performs substantially the same function, does not involve invention."

Pauling did not promote the old process to a new sphere. At best, he promoted the quality of the acids used in the old sphere from those containing organic matter to those substantially free from impurities, and in so doing he secured a higher concentration of nitric acid than had previously been secured, except by the Sohlman process.

The prior art knew, and the citations are voluminous, that impurities in the nitroglycerine waste acids weakened the nitric acid obtained in the denitrating towers. Dr. Sohlman, in using pure acids, obtained in his towers much more highly concentrated nitric acid. The prior art also knew that to secure proper denitration the steam against which the mixed acids passed must have some relation to the work to be done.

In Rohm v. Martin Dennis Co., 263 F. 106, the patent was for a process for bating hides. Judge Davis, then of the District Court, said:

"The only difference between the bate as described by" [the patentee] "and the bate which was in common use was the elimination by him of the offensive odor. * * * There is no patentable novelty in the substitution of one bate, even though superior, for another in a well-known process. Electric Boot & Shoe Finishing Co. v. Little et al., 138 F. 732, 71 C. C. A. 270."

The principles of law applicable to this case are stated by Judge Woolley in Low v. McMaster (C. C. A.) 266 F. 518, 519, as follows:

"If there is invention in the combination of the Miles patent, it is found not in any novel arrangement of elements, but in the substitution of a new fuel as an element of a combination otherwise old. That was the beginning and the end of Miles' achievement. As we regard this to be his sole contribution to the art, we think the one question of the validity of his patent is, in a word, whether the substitution of this fuel for others involves invention. On this subject it is the law, *that merely to substitute superior for inferior materials,* in making one or more or all of the *parts of a* machine or *manufacture,* is *not invention,* although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 496, 23 L. Ed. 952; Celluloid Mfg. Co. v. Crane Chemical Co. (C. C.) 36 F. 110; Potts v. Craeger,

155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275; Walker on Patents, §§ 28, 29, 36."

In the case sub judice there was no new mode of construction. It developed no new uses and properties of the article made. There was no new operation and no new function. Dr. Sohlman had attained practically the same results, using pure acids. The steam tower of the prior art, used with pure acids, produced high concentration.

Of the chemical patent cases cited by the complainant, but two are for a process. In Naylor v. Alsop Process Co., 168 F. 911, 94 C. C. A. 315, the improvement in the process of bleaching flour was the use of gaseous nitrogen peroxide. The nearest prior art patent employed ozone as a bleaching agent. Judge Amidon says, at page 917 (94 C. C. A. 321):

"The patent law, however, has its proper place in the realm of actual industrial life, and not in the limboes of parchment casuistry. The merit of a patent is to be determined, not by its standing in dialectics, but by its actual effects in the art to which it belongs. Judged by that test, the Andrews invention was revolutionary. Within five years after its discovery it had been generally applied in the milling business, both in this country and abroad. It accomplished a new and desired industrial result simply, cheaply, and efficiently. In the presence of such an experience, speculative arguments based on the prior art can seldom prevail."

However, Pauling did not do anything that was new. He used the old process, and secured what the prior art knew would be secured from the use of the purer materials.

In Holliday v. Pickhardt (C. C.) 29 F. 853, 858, the suit involved a process for the chemical manufacture of a coloring matter. Judge Wallace said in part:

"But the specification authorizes a claim for the process of sulphonating rosaniline with fuming sulphuric acid in given proportions, without regard to the anhydrous condition of the rosaniline or the density of the sulphuric acid employed, and the terms of the process claim are commensurate with such a process. The process claim must therefore be construed as embracing the conversion of the rosaniline by means of fuming sulphuric acid, without respect to the anhydrous condition of the rosaniline, or the peculiar strength of the fuming acid. Thus construed, the process claim is void for want of novelty. The art of sulphonating dyestuffs by combining them with the elements of sulphuric acid, and converting them into

sulpho-acids, is very old. The proofs show that prior to the date of the invention of Holliday it was well known in the art that, owing to the character of unsulphonated indigo, the coloring matter thereof could not be employed, either alone or mixed with other coloring matters, where the process of dyeing or printing required the employment of an acid or acid mordant; and that the indigo, by being sulphonated, could be converted into new coloring matter, possessing acid properties, and retaining substantially its original color when used in an acid bath. The proofs also show that the process for sulphonating indigo was substantially the same as the process of the Holliday patent, disregarding the reference to the degrees Beaume; and the treatment of the rosaniline to render it anhydrous."

[3] A further reference to the authorities seems unnecessary. None meet the case. Novelty must lie in more than doing precisely the same things that the prior art did.

[4] The Lunge tower and the other steam towers of the denitrating art were not changed or modified, and the acids, free from impurities, used in the Pauling process, were known to result in high concentration.

The bill will be dismissed.